UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------X
COSA XENTAUR CORPORATION, f/k/a COSA
INSTRUMENT CORPORATION and XENTAUR
CORPORATION,

                          Plaintiff,

          -against-

DAVID BOW,

                          Defendant.
----------------------------------------X

**FILED**
**IN CLERK'S OFFICE**
**DISTRICT COURT E D N Y**

★ MAR 3 1 2014 ★
**LONG ISLAND OFFICE**

MEMORANDUM & ORDER
13-CV-2912(JS)(ARL)

APPEARANCES
For Plaintiff:      Loretta M. Gastwirth, Esq.
                    Paul M. Rubell, Esq.
                    Meltzer, Lippe, Goldstein
                     & Breitstone, LLP
                    190 Willis Avenue
                    Mineola, NY 11501

For Defendant:      Colleen M. McLaughlin, Esq.
                    Law Offices of Colleen McLaughlin
                    1751 S Naperville Rd., Suite 209
                    Wheaton, IL 60189

                    Melissa E. Pierre-Louis, Esq.
                    Outten & Golden LLP
                    3 Park Avenue
                    New York, NY 10016

SEYBERT, District Judge:

          Plaintiff Cosa Xentaur Corporation ("Plaintiff" or
"COSA") commenced this action on May 17, 2013 against defendant
David Bow ("Defendant" or "Bow"), a former COSA executive,
alleging, inter alia, that Bow breached his employment agreement
with COSA when he failed to return commission payments, which,
according to COSA, were in excess of the amounts agreed upon under

Bow's employment agreement. Bow has moved to dismiss the Complaint for improper venue pursuant to Federal Rule of Civil Procedure 12(b)(3) and 28 U.S.C. § 1406(a) or, in the alternative, to transfer venue to the Northern District of Illinois pursuant to 28 U.S.C. § 1404(a). (Docket Entry 7.) COSA has opposed Bow's motion and filed a cross-motion pursuant to the first-filed rule seeking to enjoin a later-filed, related lawsuit that Bow filed in the Northern District of Illinois. (Docket Entry 15.) Bow has also moved to strike four declarations that COSA submitted in connection with its opposition and cross-motion. (Docket Entries 19 & 26.) For the following reasons, Bow's motion to dismiss for improper venue is DENIED, Bow's motion to transfer venue is DENIED, COSA's motion to enjoin the Illinois action is GRANTED, and Bow's motions to strike are DENIED.

## BACKGROUND

COSA is a Delaware corporation that provides high technology instrumentation for use in various industrial and energy industries. (Compl. ¶¶ 1, 9.) It maintains its corporate headquarters and principal place of business in Yaphank, New York, which is located in this District. (Compl. ¶ 1.) COSA employed Bow--who is a resident of Vernon Hills, Illinois--as Senior Vice President of Commercial Development from September 30, 2010 until March 8, 2013. (Compl. ¶ 10; Bow Decl., Docket Entry 10, ¶ 19.) As discussed more fully below, during the course of his employment,

2

Bow worked primarily from his home office in Illinois and spent the remainder of his time traveling to other domestic and international locations for sales purposes.

In the Spring of 2010, COSA posted a job advertisement on the social networking website, LinkedIn, for the position of Vice President of Global Sales--a new position that would entail supervising COSA's domestic and international sales and also included responsibility for direct sales to domestic accounts on the West Coast. (Allshouse Decl., Docket Entry 16, ¶¶ 6-8.) Bow responded to the advertisement and had an initial phone interview. (Bow Decl. ¶ 4.) In August 2010, COSA "flew . . . Bow from Chicago to Islip, New York" for a "full day of meetings" with COSA's President and Chief Operating Officer, Craig Allshouse ("Allshouse"), and COSA's Chief Executive Officer and Chief Financial Officer. (Allshouse Decl. ¶ 7.) Bow contends that the meeting in New York was "essentially nothing more than an initial interview." (Def.'s Reply Br. in Supp. of Mot. to Dismiss and in Opp. to Pl.'s Cross-Mot. ("Def.'s Reply Br."), Docket Entry 21, at 2.)

In September 2010, Bow visited COSA's Houston offices where some of COSA's sales personnel were located. (Allshouse Decl. ¶ 7.) Bow claims that the parties began "talking about the terms of employment" during the Houston meeting and that the

3

parties conducted the remainder of the employment negotiations by phone. (Bow Decl. ¶ 4.)

On September 17, 2010, Allshouse, who works in COSA's New York office, e-mailed Bow stating that the prior meeting "was very positive" and that he "want[ed] to move forward towards getting [Bow] on board the Cosa Xentaur team." (Allshouse Decl. Ex. C.) Allshouse provided a "draft outline" of the initial position objectives, including that the position would be "Vice President of Global Sales based in Cosa Xentaur's Houston Office" and that Bow would receive a base salary in the "$160K range with a commission plan that [would] put the total compensation in the $225K range based on current sales" of the company. (Allshouse Decl. Ex. C.)

On September 20, 2010, Bow responded to Allshouse by e-mail from Illinois requesting $20,000 in additional base salary and a change of position title to "Executive Vice President of Global Sales, Services and Marketing" or "Chief Commercial Officer." (Allshouse Decl. Ex. C.) Bow also requested a severance agreement that would provide Bow a pre-determined amount of severance pay in the event he was terminated without cause or if he lost his job due to a "change in control." (Allshouse Decl. Ex. C.)

COSA agreed in part to Bow's requests and, on September 30, 2010, Allshouse e-mailed Bow a formal offer of

4

employment (the "Employment Letter"). (Allshouse Decl. Ex. D.)
The Employment Letter stated that Bow's position title would be
"Senior Vice President, Commercial Development reporting to the
President/COO" and that COSA's offer was "contingent upon [Bow's]
relocation to the COSA Houston office within 18 months from the
start date of [Bow's] employment." (Allshouse Decl. Ex D.) The
Employment Letter also provided that Bow's base salary would be
$170,000 and that he would receive monthly commissions based on a
percentage formula of all net paid sales of the company, not just
the direct sales Bow made. (Allshouse Decl. Ex D.)

Bow accepted the offer by e-mail from his home in
Illinois but conditioned his acceptance upon the parties entering
into a severance agreement. (Bow Decl. ¶ 5.) On October 5, 2010,
Allshouse e-mailed Bow a severance agreement (the "Severance
Agreement"), which Bow signed in Illinois and e-mailed back to
Allshouse.[1] (Bow Decl. ¶ 6.) Allshouse signed the Severance
Agreement the same day and sent an executed version back to Bow.
(Bow Decl. ¶ 6; Allshouse Decl. Ex. E.) During the negotiations,
no employee of COSA ever traveled to Illinois and Bow never
traveled to New York, with the exception of the initial meeting at
COSA's New York headquarters in August 2010.

---

[1] Bow claims that he sent Allshouse a draft severance agreement,
(Bow Decl. ¶ 5), while COSA claims that Bow asked COSA to draft
a severance agreement (Allshouse Decl. ¶ 10).

As noted above, the parties initially agreed that Bow's position would be based out of COSA's Houston office. However, Bow subsequently asked if he could work remotely from his home office in Illinois until his son graduated from high school. (Allshouse Decl. ¶ 11; Bow Decl. ¶ 7.) COSA accommodated Bow because his job would require significant travel time anyway. (Allshouse Decl. ¶ 11.) Thereafter, Bow remained in Illinois for the duration of his employment for additional personal reasons. (Allshouse Decl. ¶ 11.)

As Senior Vice President of Commercial Development, Bow reported directly to Allshouse and was responsible for the sale of scientific instrumentation to laboratories and manufacturers globally. (Bow Decl. ¶ 8.) Bow claims that he performed approximately fifty percent of his job duties from his home office in Illinois and that he spent the remainder of his time in COSA's Houston office and other locations around the world for sales purposes and to mentor and train sales representatives. (Bow Decl. ¶ 11.) COSA does not dispute Bow's characterization of his time spent in Illinois. Instead, COSA contends that although Bow had responsibilities in Illinois and on the road, he was a top executive in the New York-based company and therefore "had . . . physical presence and importance in COSA's headquarters in [New York]." (Allshouse ¶ 12.) COSA states, for example, that Bow "connected to COSA's main servers in New York almost every day

6

to carry out his responsibilities" and that he frequently reported to Allshouse in New York and COSA's former Chief Financial Officer, Bob Striedl, who both worked in COSA's New York headquarters. (Allshouse Decl. ¶¶ 12, 16.) Bow also reviewed regional sales reports that were generated in New York and also oversaw and directed the company's sales compensation and commission structures, which were determined, approved, and implemented from COSA's New York headquarters. (Allshouse Decl. ¶ 16.) In addition, as Bow admits, he made one to two visits per year to COSA's New York office for work. (Bow Decl. ¶ 12.)

As noted above, Bow received commissions based on a percentage formula set forth in his Employment Letter. (Allshouse Decl. Ex. D.) By letter dated January 25, 2013, COSA's Chief Financial Officer, Arthur Wasserspring ("Wasserspring"), informed Bow that COSA had incorrectly calculated Bow's commission payments for the fiscal year of 2012, resulting in an overpayment of $89,256.28 to Bow. (Allshouse Decl. Ex. F.) Wasserspring proposed that the overpayment be deducted from Bow's future commission payments. (Allshouse Decl. Ex. F.) Bow objected and Allshouse claims that he "pressed [Bow] for a return of the overpaid commissions." (Allshouse Decl. ¶ 22.)

The parties were unable to resolve the dispute. On March 8, 2013, COSA terminated Bow's employment effective that same day. (Bow Decl. ¶ 19; Allshouse Decl. Ex. H.) By letter

dated March 14, 2013, COSA sent Bow a general release, which the Severance Agreement required Bow to sign as a condition to receiving severance payments under the agreement. (Allshouse Decl. Exs. E & I.) The March 14th letter further advised that upon execution of the general release, COSA would initiate Bow's severance payments but that it would deduct the $89,256.28 in alleged overpaid commission from the payments. (Allshouse Decl. Ex I.) Bow declined to sign the release, and COSA did not make any severance payments to Bow.

Starting at the end of March 2013 through the middle of May 2013, attorneys for Bow and COSA exchanged a series of letters and e-mails regarding the dispute. On March 28, 2013, Bow's attorney, Colleen McLaughlin ("McLaughlin"), wrote to Allshouse stating that COSA's failure to pay Bow his full severance "would result, at a minimum, in violations of New York and Illinois wage laws as well as [ERISA]." (Rubell Decl., Docket Entry 17, Ex. A.) McLaughlin demanded that COSA "reconsider its decision to offset [the] alleged overpayment from [Bow's] severance payment" and stated that Bow "hope[d] that [the parties could] nip any potential conflicts in the bud" and "arrive at a mutually agreeable release." (Rubell Decl. Ex. A.) The March 28th letter did not contain a specific threat of litigation, a deadline for the commencement of litigation, or a potential venue for litigation. (See Rubell Decl. Ex. A.)

By letter dated May 2, 103, COSA's general counsel, Paul Rubell ("Rubell"), responded to McLaughlin. (Rubell Decl. Ex. B.) Rubell rejected Bow's position, demanded the immediate return of the $89,256.78 in alleged overpaid commissions, and suggested that COSA would commence an action against Bow to recover the alleged overpayment: "Unless COSA receives an immediate return of the overpayment of $89,256.78 made to Bow on or before May 9, 2013, COSA will have no alternative but to take all steps necessary to retrieve that sum." (Rubell Decl. Ex. B.)

By e-mail dated May 6, 2013, Rubell advised McLaughlin that COSA wanted "to review [Bow's] mathematical computation of the commission that was paid to [Bow] for 2011 and 2012." (McLaughlin Reply Decl., Docket Entry 21-2, Ex. 2.) However, Rubell reiterated that COSA believed that it had overpaid Bow but that it was "willing to listen to [Bow's] point of view." (McLaughlin Reply Decl. Ex. 2.)

By letter dated May 8, 2013, McLaughlin responded, stating that "it [was] COSA who [was] in breach of the Severance Agreement" and that COSA would "face major hurdles in court should it continue to refuse to pay the full amount of the severance owed to [Bow]." (Rubell Decl. Ex. C.) McLaughlin further demanded that COSA reimburse Bow for $30,000 in business expenses Bow had allegedly incurred. (Rubell Decl. Ex. C.) McLaughlin stated that Bow was "willing to make a reasonable compromise of his claims" in

that he would "waive recovery of [his attorney's] fees and provide COSA with a signed General Release, if COSA agree[d] to pay the agreed upon severance and the business expenses for which [Bow was] to be reimbursed by Friday May 10." (Rubell Decl. Ex. C.) She concluded her letter stating "[i]f COSA is serious about avoiding litigation, it will give due consideration to this settlement offer." (Rubell Decl. Ex. C.)

Although McLaughlin's May 8th letter contained a May 10th deadline for COSA to pay Bow's full severance, Rubell did not respond until May 13, 2013, three days after the deadline, and Bow did not commence litigation. Rubell's May 13th letter indicated that COSA preferred to settle the matter but made clear that COSA believed that Bow had not made a "substantive settlement offer" and that COSA "would need a meaningful settlement offer from [Bow]" to resolve the dispute. (Rubell Decl. Ex. D.)

On Wednesday, May 15, 2013, McLaughlin e-mailed Rubell and advised him that she would be traveling but could speak with him on either Thursday afternoon or Friday morning of that week. (McLaughlin Reply Decl. Ex. 3.) Rubell e-mailed McLaughlin on the morning of Friday, May 17, 2013 and advised McLaughlin that he was available to speak all day. (McLaughlin Reply Decl. Ex. 4.) According to McLaughlin, she did not respond to Rubell's e-mail because she "was attending [her] sister's wedding in Florida the weekend of May 17 . . . ." (McLaughlin Reply Decl. ¶ 11.) At

10

this point, having not received what COSA believed to be a reasonable settlement offer, COSA determined that it should commence litigation to recover the alleged overpaid commission. (Rubell Decl. ¶ 21.) Accordingly, COSA filed the Complaint in this action on May 17, 2013 (the "New York Action"). The Complaint alleges claims for (1) breach of the Employment Letter; (2) money had and received; (3) unjust enrichment; and (4) a declaratory judgment that the alleged overpaid commissions constituted advances against any severance payments owed Bow under the Severance Agreement.

McLaughlin and Rubell spoke briefly on the morning of Monday, May 20, 2013, but McLaughlin's cell phone battery died before they could finish their conversation. (Rubell Decl. ¶ 23; McLaughlin Reply Decl. ¶ 13.) Before her cell phone died, however, McLaughlin presented a revised settlement offer that Bow would waive any additional commissions he believed he was owed and the statutory penalty Bow believed he was entitled to under the Illinois Wage Payment and Collection Act. (McLaughlin Reply Decl ¶ 13.) However, because Bow would not agree to compromise any portion of the amount COSA alleged it had overpaid, COSA decided to serve Bow with the Summons and Complaint in the New York Action. (Rubell Decl. ¶ 23.)

Bow was served with the Summons and Complaint on the evening of May 21, 2013. (Docket Entry 4.) Before service was

11

made, however, McLaughlin and Rubell spoke again by telephone that morning. According to McLaughlin, she "advised [Rubell] that [the parties] were approaching [the] dispute from two very different angles" and that Bow "want[ed] that to which he [was] entitled and ha[d] no interest in arriving at a middle ground." (McLaughlin Reply Decl. ¶ 15.)

Two weeks later, on June 4, 2013, Bow filed a complaint against COSA in the Northern District of Illinois asserting claims for: (1) unpaid severance and commission under the Illinois Wage Payment and Collection Act ("IWPCA"); (2) breach of the Severance Agreement; (3) an accounting of unpaid commissions under the IWPCA; and (4) breach of the Employment Letter for unpaid business expenses Bow incurred during his employment (the "Illinois Action"). (Bow Decl. Ex. 1.)

DISCUSSION

Bow moves to dismiss the Complaint for improper venue under Federal Rule of Civil Procedure 12(b)(3) and 28 U.S.C. § 1406(a), or in the alternative, to transfer venue to the Northern District of Illinois pursuant to 28 U.S.C. § 1404(a). COSA has filed a cross-motion pursuant to the first-filed rule seeking to enjoin the second-filed Illinois Action. Because Bow has challenged venue, COSA first has the burden of proving that venue is proper in this forum. See Jaguar Cars, Ltd. v. Nat'l Football League, 886 F. Supp. 335, 338 (S.D.N.Y. 1995). Accordingly, the

Court will first address Bow's motion to dismiss for improper venue.

## I. Bow's Motion to Dismiss for Improper Venue

Under Federal Rule of Civil Procedure 12(b)(3), a defendant may move to dismiss an action based on "improper venue." FED. R. CIV. P. 12(b)(3). In addition, 28 U.S.C. § 1406(a) provides that the "district court of a district in which is filed a case laying venue in the wrong division or district shall dismiss, or if it be in the interest of justice, transfer such case to any district or division in which it could have been brought." 28 U.S.C. § 1406(a).

In this case, COSA alleges that venue is proper in the Eastern District of New York pursuant to 28 U.S.C. § 1391(b)(2), which provides, in relevant part, that venue is proper in "a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred . . . ." (See Compl. ¶ 5.); 28 U.S.C. § 1391(b)(2). Bow contends that this case should be dismissed for improper venue because the Northern District of Illinois is the only proper venue under § 1391(b)(2). (Def.'s Br. in Supp. of Mot. to Dismiss ("Def.'s Br."), Docket Entry 8, at 6.) The Court will first set forth the legal standard on a Rule 12(b)(3) motion to dismiss before turning to the parties' arguments.

13

A.    Legal Standard

When considering a motion to dismiss for improper venue, the Court must accept the facts alleged in the complaint as true and draw all reasonable inferences in favor of the plaintiff. Cartier v. Micha, Inc., No. 06-CV-4699, 2007 WL 1187188, at *2 (S.D.N.Y. Apr. 20, 2007). Although the plaintiff has the burden of proving that venue is proper, "[a]bsent a formal hearing on the motion, [a] plaintiff need only make a prima facie showing of [venue]." Id. (citing Gulf Ins. Co. v. Glasbrenner, 417 F.3d 353, 355 (2d Cir. 2005)). In ruling on the motion, the Court "may rely on facts and consider documents outside the complaint." See id. If the plaintiff asserts multiple claims, "venue must be proper as to each of the claims asserted, but a common factual basis between a claim where venue is proper and one where venue is improper may defeat dismissal of a claim for improper venue." Id. (citing E.P.A. ex rel. McKeown v. Port Auth. of N.Y. & N.J., 162 F. Supp. 2d 173, 183 (S.D.N.Y. 2001), aff'd, McKeown v. Del. Bridge Auth., 23 F. App.'x 81 (2d Cir. 2001)).

As noted above, COSA alleges that venue is proper in the Eastern District of New York under 28 U.S.C. § 1391(b)(2). The Court must conduct a two-part analysis to determine whether venue is appropriate under § 1391(b)(2). Daniel v. Am. Bd. of Emergency Med., 428 F.3d 408, 432 (2d Cir. 2005); Cold Spring Harbor Lab. V. Ropes & Gray LLP, 762 F. Supp. 2d 543, 553 (E.D.N.Y. 2011); Sea

14

Tow Servs. Int'l, Inc. v. Pontin, 472 F. Supp. 2d 349, 363 (E.D.N.Y. 2007). First, the Court must "identify the nature of the claims and the acts or omissions that the plaintiff alleges give rise to those claims." Daniel, 428 F.3d at 432 (citing Gulf Ins. Co., 417 F.3d at 357). Second, the Court must "determine whether a substantial part of those acts or omissions occurred in the district where suit was filed, that is, whether 'significant events or omissions material to [those] claim[s] . . . have occurred in the district in question.'" Id. (alterations and omission in the original) (quoting Gulf Ins. Co., 417 F.3d at 357).

The Second Circuit has further stated that "'[s]ubstantiality' for venue purposes is more a qualitative than a quantitative inquiry, determined by assessing the overall nature of the plaintiff's claims and the nature of the specific events or omissions in the forum, and not by simply adding up the number of contacts." Id., at 432-33. In other words, "[w]hen material acts or omissions within the forum bear a close nexus to the claims, they are properly deemed 'significant' and, thus, substantial, but when a close nexus is lacking, so too is the substantiality necessary to support venue." Id. at 433 (citing Jenkins Brick Co. v. Bremer, 321 F.3d 1366, 1372 (11th Cir. 2003) (explaining that substantiality requirement of § 1391(b)(2) requires consideration only of acts or omissions that "have a close nexus to the wrong")).

15

Finally, venue can be proper in multiple districts, "as long as 'a substantial part' of the underlying events took place in those districts." Gulf Ins. Co., 417 F.3d at 356 (quoting 28 U.S.C. § 1391(b)(2)); Shpak v. Curtis, No. 10-CV-1818, 2011 WL 4460605, at *6 (E.D.N.Y. Sept. 26, 2011). Thus, the issue is not whether the district at issue is the "best venue." Bates v. C & S Adjusters, Inc., 980 F.2d 865, 867 (2d Cir. 1992). Rather, under § 1391(b)(2), the Court "must determine only whether a 'substantial part of the events . . . giving rise to the claim' occurred in the [district at issue]." Id. (emphasis added) (ellipsis in original) (quoting 28 U.S.C. § 1391(b)(2)); accord Marcus v. Am. Contract Bridge League, 562 F. Supp. 2d 360, 363 (D. Conn. 2008); Hall v. S. Orange, 89 F. Supp. 2d 488, 493 (S.D.N.Y. 2000). In addition, venue may be appropriate "even if a greater portion of events occurred elsewhere." Sea Tow, 472 F. Supp. 2d at 364 (citing Concesionaria DHM, S.A. v. Int'l Finance Corp., 307 F. Supp. 2d 553, 559 (S.D.N.Y. 2004)).

B. Application

Where, as in this case, a contract forms the basis of the plaintiff's claims, "courts consider a number of factors, including where the contract was negotiated or executed, where it was to be performed, and where the alleged breach occurred." PI, Inc. v. Quality Prods., Inc., 907 F. Supp. 752, 757-58 (S.D.N.Y. 1995). "'Venue may be proper in the district where the contract

was substantially negotiated, drafted, and/or executed, even if the contract was not to be performed in that district and the alleged breach occurred elsewhere.'" Gen. Capital Partners LLC v. Liberty Ridge, LLC, No. 07-CV-4089, 2007 WL 3010028, at *2 (S.D.N.Y. Oct. 12, 2007) (quoting ESI, Inc. v. Coastal Power Prod. Co., 995 F. Supp. 419, 425 (S.D.N.Y. 1998)). Moreover, "where a communication 'is transmitted to or from the district in which the cause of action is filed,' venue is appropriate in that district 'given a sufficient relationship between the communication and the cause of action.'" Id. (quoting Sacody Techs., Inc. v. Avant, Inc., 862 F. Supp. 1152, 1157 (S.D.N.Y. 1994)).

COSA has established a prima facie case that venue is proper in the Eastern District of New York. First, the fact that Bow and COSA negotiated and executed the Employment Letter at least partially in New York is sufficient by itself for this action to proceed in the Eastern District of New York. See, e.g., Gen. Capital, 2007 WL 3010028, at *2 ("[T]he fact that the underlying contract was at least partially negotiated and executed in New York is, standing alone, sufficient for this action to proceed in this District."). There is no dispute that Bow had telephone conversations with COSA executives in New York and also sent an e-mail into New York to negotiate and finalize his employment agreement. Although some of the negotiations occurred in Houston, the documentary evidence demonstrates that Bow made significant

17

contract demands via e-mail sent to New York, including a change in the offered position title, an increase in compensation, and a severance agreement. Moreover, while Bow characterizes his initial meeting with COSA executives in New York as "essentially nothing more than an initial interview," (Def.'s Reply Br., Docket Entry 21, at 2.), he also admits that he and COSA "discussed compensation in general terms" at that meeting (Bow Reply Decl., Docket Entry 21-1, ¶ 1). Contrary to Bow's contention, the fact that Bow negotiated and accepted his terms of employment from Illinois does not mean that venue is proper only in Illinois; it just means that venue may also be proper in Illinois. Largotta v. Banner Promotions, Inc., 356 F. Supp. 2d 388, 391 (S.D.N.Y. 2005) ("[T]he fact that [defendant] often was elsewhere during [contract negotiation] conversations simply means that venue would also be proper in other locations, not that it is improper in New York."); Sacody Tech., 862 F. Supp. at 1157 (finding venue appropriate in New York where "at least some of defendants' dealings with [plaintiff regarding the contract at issue] took place over the phone and by correspondence and facsimile between [defendants] and [plaintiff] in Massachusetts and New York, respectively" (internal quotation marks omitted)); Schomann Int'l Corp. v. N. Wireless, Ltd., 35 F. Supp. 2d 205, 213 (N.D.N.Y. 1999) (finding that an agreement was "negotiated and executed in both New York and Iowa" where "the parties negotiated and executed [its]

18

terms . . . through telephone conversations and correspondence between their respective New York and Iowa offices").

Second, the terms of the Employment Letter indicate an expectation of some performance on Bow's part in New York. For example, the Employment Letter states that Bow would "report[] to [Allshouse], the President/COO," who worked in COSA's New York office, which is located in this District. Additionally, it is undisputed that Bow traveled to COSA's headquarters at least one to two times per year to carry out his employment duties and that Bow was involved in policy and strategic management decisions that were made at COSA's New York headquarters. And although the Court agrees that the alleged breach—i.e., that Bow failed to return the alleged overpaid commissions--did not occur in New York, that breach was precipitated by the alleged miscalculation of Bow's commission payments in New York and caused injury in New York. Accordingly, because a number of critical events giving rise to COSA's breach of contract claim occurred in this District, the Court finds that COSA has made a prima facie showing that venue for the contract claim is proper in this District.

For substantially the same reasons, the Court finds that venue for COSA's claim for declaratory judgment--which seeks a judgment that the alleged overpaid commissions constituted advances against any severance payments owed Bow under the Severance Agreement--is also proper in this District. Finally,

19

with respect to COSA's claims for unjust enrichment and money had and received, while an argument may be made that a substantial part of the events giving rise to those claims occurred in Illinois (due to the fact that Bow withheld repayment in Illinois), the Court finds that the critical events giving rise to COSA's breach of contract claim also form a substantial basis for COSA's unjust enrichment and money had and received claims.

In sum, drawing all reasonable inferences in favor of COSA, the Court finds that the Eastern District of New York is a forum in which a substantial part of the underlying events giving rise to each of COSA's claims occurred. Accordingly, venue in this District is proper under § 1391(b)(2).

## II. COSA's Motion to Enjoin the Illinois Action and Bow's Motion to Transfer Venue to the Northern District of Illinois

Having determined that venue is proper in this District, the Court will now turn to COSA's motion to enjoin the Illinois Action pursuant to the first-filed rule and Bow's alternative motion to transfer this case to the Northern District of Illinois pursuant to 28 U.S.C. § 1404(a). The Court will first set forth the legal standards before addressing the merits of the motions.

### A. Legal Standards

#### 1. Transfer Pursuant to 28 U.S.C. § 1404

Under 28 U.S.C. § 1404(a), a district court, "[f]or the convenience of parties and witnesses, in the interest of

20

justice, . . . may transfer any civil action to any other district or division where it might have been brought . . . ." 28 U.S.C. § 1404(a). "The goal of Section 1404(a) is to prevent waste of time, energy and money and to protect litigants, witnesses and the public against unnecessary inconvenience and expense." Blechman v. Ideal Health, Inc., 668 F. Supp. 2d 399, 403 (E.D.N.Y. 2009) (internal quotation marks and citations omitted). In deciding whether a transfer is warranted, courts consider several factors including:

> (1) the convenience of the parties; (2) the convenience of witnesses; (3) the relative means of the parties; (4) the locus of operative facts and relative ease of access to sources of proof; (5) the attendance of witnesses; (6) the weight accorded the plaintiff's choice of forum; (7) calendar congestion; (8) the desirability of having the case tried by the forum familiar with the substantive law to be applied; (9) practical difficulties; and (10) how best to serve the interest of justice, based on an assessment of the totality of material circumstances.

Innovations Enter. Ltd. v. Haas-Jordan Co., No. 99-CV-1681, 2000 WL 263745, at *1 (E.D.N.Y. Jan. 4, 2000). The party requesting transfer carries the "burden of making out a strong case for transfer," N.Y. Marine & Gen. Ins. Co. v. Lafarge N. Am., Inc., 599 F.3d 102, 113-14 (2d Cir. 2010) (internal quotation marks and citation omitted), and the plaintiff's choice of forum "should not be disturbed unless the balance of factors tips decidedly in favor of a transfer," Wildwood Imps. v. M/V Zim Shanghai, No. 04-CV-

5538, 2005 WL 425490, at *3 (S.D.N.Y. Feb. 20, 2005); <u>see also</u> <u>N.Y. Marine</u>, 599 F.3d at 114.  The district court, however, retains broad discretion over the ultimate decision to transfer.  <u>See In re Cuyahoga Equip. Corp.</u>, 980 F.2d 110, 117 (2d Cir. 1992) ("[M]otions for transfer lie within the broad discretion of the district court and are determined upon notions of convenience and fairness on a case-by-case basis.").

    2.   <u>First-Filed Rule</u>

Where more than one court has "'concurrent jurisdiction over an action involving the same parties and issues, courts will follow a 'first-filed' rule, whereby the court which first has possession of the action decides it.'"  <u>Am. Steamship Owners Mut. Prot. and Indem. Ass'n, Inc. v. Lafarge N. Am., Inc.</u>, 474 F. Supp. 2d 474, 481 (S.D.N.Y. 2007) (quoting <u>800-Flowers, Inc. v. Intercontinental Florist, Inc.</u>, 860 F. Supp. 128, 131 (S.D.N.Y. 1994)).  The first-filed rule is applicable only where the suits are duplicative.  <u>Am. Steamship</u>, 474 F. Supp. 2d at 481 (citing <u>Spotless Enters., Inc. v. The Accessory Corp.</u>, 415 F. Supp. 2d 203, 205 (E.D.N.Y. 2006).  This principle requires "substantial overlap" between the suits in that they have "identical or substantially similar parties and claims."  <u>Id.</u>

The first-filed rule "embodies considerations of judicial administration and conservation of resources . . . by avoiding duplicative litigations . . . ."  <u>First City Nat'l Bank</u>

& Trust Co. v. Simmons, 878 F.2d 76, 80 (2d Cir. 1989). "Because parties 'should be free from the vexation of concurrent litigation over the same subject matter,' there is a strong presumption that a later lawsuit will be dismissed in favor of the first-filed lawsuit." Dish Network, LLC v. Am. Broad. Cos., No. 12-CV-4155, 2012 WL 2719161, at *2 (S.D.N.Y. July 9, 2012) (quoting Adam v. Jacobs, 950 F.2d 89, 93 (2d Cir. 1991)). "[W]here an action is brought in one federal district court and a later action embracing the same issue is brought in another federal court, the first court has jurisdiction to enjoin the prosecution of the second action." City of N.Y. v. Exxon Corp., 932 F.2d 1020, 1025 (2d Cir. 1991).

However, the presumption in favor of the first-filed suit "is not to be applied in a 'rigid' or 'mechanical' way." Dornoch Ltd. ex rel. Underwriting Members of Lloyd's Syndicate 1209 v. PBM Holdings, Inc., 666 F. Supp. 2d 366, 369 (S.D.N.Y. 2009) (quoting Columbia Pictures Indus., Inc. v. Schneider, 435 F. Supp. 742, 747 (S.D.N.Y. 1977), aff'd, 573 F.2d 1288 (2d Cir. 1978)). The Second Circuit has recognized two exceptions that warrant departure from the first-filed rule: "(1) where the 'balance of convenience' favors the second-filed action, and (2) where 'special circumstances' warrant giving priority to the second suit." Emp'rs Ins. of Wausau v. Fox Entm't Grp., Inc., 522 F.3d 271, 275 (2d Cir. 2008) (internal citations omitted).

In applying the "balance of convenience" exception, courts must consider "the ties between the litigation and the forum of the first-filed action." Id. The factors relevant to this analysis are the same as those applied in connection with motions to transfer venue pursuant to 28 U.S.C. § 1404(a). Id.; Am. Steamship, 474 F. Supp. 2d. at 481; Blechman, 668 F. Supp. 2d at 404. Accordingly, a single analysis will resolve both issues. Am. Steamship, 474 F. Supp. 2d. at 481; Blechman, 668 F. Supp. 2d at 404.

B.   Application

Bow does not dispute that the New York Action and the Illinois Action are duplicative. Indeed, both actions involve the same parties and assert claims that arise out of the same dispute--Bow's commission and severance payments. In the New York Action, COSA primarily alleges that Bow breached the Employment Letter when he failed to return overpaid commissions. In the Illinois Action, Bow primarily alleges that COSA breached the Severance Agreement when it informed Bow that it would offset the alleged overpayments against Bow's severance payment. Thus, the issue here is whether a special circumstance exists to warrant giving priority to the second-filed action, the Illinois Action, or whether the balance of convenience favors Illinois. Bow urges the Court to depart from the first-filed rule and transfer the New York Action to the Northern District of Illinois because: (1) the

24

New York Action is an improper anticipatory filing; and (2) the factors applicable to both a motion to change venue and the balance of convenience analysis under the first-filed rule favor the Illinois Action. The Court will address each argument in turn.

## 1. Improper Anticipatory Litigation

One exception to the first-filed rule exists "where the first-filed lawsuit constitutes an 'improper anticipatory filing,' or one made under the apparent threat of a presumed adversary filing the mirror image of that suit in a different federal district." Oleg Cassini, Inc. v. Serta, Inc., No. 11-CV-8751, 2012 WL 844284, at *4 (S.D.N.Y. Mar. 13, 2012) (quoting Ontel Prods., Inc. v. Project Strategies Corp., 899 F. Supp. 1144, 1150 (S.D.N.Y. 1995)). As the court in Ontel explained:

> A filing in this context is improper where it attempts to exploit the first-filed rule by securing a venue that differs from the one that the filer's adversary would be expected to choose. Where a party is prepared to pursue a lawsuit, but first desires to attempt settlement discussions, that party should not be deprived of the first-filed rule's benefit simply because its adversary used the resulting delay in filing to proceed with the mirror image of the anticipated suit. Otherwise, potential plaintiffs would be discouraged from first attempting to resolve their claims without resorting to litigation.

Ontel, 899 F. Supp. at 1150. "The Second Circuit has held that the filing of a declaratory judgment action triggered by a notice[-of-suit] letter is a persuasive indicator of anticipatory conduct." Chicago Ins. Co. v. Holzer, No. 00-CV-1062, 2000 WL

25

777907, at *3 (S.D.N.Y. June 16, 2000) (citing Factors Etc., Inc. v. Pro Arts, Inc., 579 F.2d 215, 219 (2d Cir. 1978), abrogated on other grounds by Pirone v. MacMillan, Inc., 894 F.2d 579, 586 (2d Cir. 1990). Here, the New York Action contains a declaratory judgment claim, which indicates that COSA anticipated that Bow might commence litigation to recover his severance payments. However, just because COSA may have anticipated litigation, does not mean that COSA commenced the New York Action improperly. As discussed below, the Court finds that, although COSA included a declaratory judgment claim in the New York Action, there are no facts here that indicate that the New York Action was an improper anticipatory filing.

For a lawsuit to be improperly anticipatory, the suit must be filed "in response to a direct threat of litigation that gives specific warnings as to deadlines and subsequent legal action." Employers Ins. of Wausau, 522 F.3d at 276 (emphasis added); accord Eternal Asia Supply Mgmt. (USA) Corp. v. EQD Corp., No. 12-CV-0058, 2012 WL 6186504, at *6 (S.D.N.Y. Dec. 12, 2012). Accordingly, numerous courts in this Circuit "have declined to characterize a first-filed suit as anticipatory where the notice letter that preceded it does not explicitly 'inform[] a defendant of the intention to file suit, a filing date, and/or a specific forum for the filing of the suit.'" Oleg, 2012 WL 844284, at *5

(quoting Schnabel v. Ramsey Quantitative Sys., 322 F. Supp. 2d 505, 512 (S.D.N.Y. 2004) (collecting cases).

Bow first argues that the New York Action is an improper anticipatory suit because COSA filed it in response to Bow's March 28, 2013 demand letter, which, according to Bow, "provided sufficient notice of threatened litigation." (Def.'s Reply Br. at 9.) The Court disagrees. Bow's March 28th letter did not express an intention to file suit, nor did it state a deadline or identify a venue for the filing of suit. The March 28th letter therefore cannot be deemed a notice sufficient to trigger the anticipatory litigation exception to the first-filed rule. See Fandino v. Amalgam Entm't, LLC, No. 09-CV-8325, 2010 WL 607819, at *3 (S.D.N.Y. Feb. 19, 2010) (finding that first-filed suit was not an improper anticipatory filing where letters "mentioned the general possibility of future legal action," "did not mention either a date or forum," and included "merely general threats"); J. Lyons & Co. Ltd. v. Republic of Tea, Inc., 892 F. Supp. 486, 491 (S.D.N.Y. 1995) (finding that cease and desist letters did not provide notice of litigation, even though they "mentioned the possibility of legal actions," because they "did not specify any date or a forum"). In fact, Bow's comments that he hoped to "nip any potential conflicts in the bud" and "arrive at a mutually agreeable release" indicate that Bow was attempting to initiate settlement negotiations rather than provide notice that he intended to file a lawsuit. See

<u>Employers Ins. of Wausau v. Prudential Ins. Co. of Am.</u>, 763 F. Supp. 46, 48 (S.D.N.Y. 1991) (finding that letter stating that party "hoped to avoid litigation" could not be construed as notice of intent to litigate).

Bow's second letter on May 8, 2013 also lacked the requisite specificity to put COSA on notice that Bow intended to commence a lawsuit. Although the May 8th letter set a deadline of May 10, 2013 for COSA to accept Bow's settlement offer, the letter only vaguely stated that "[i]f COSA [was] serious about avoiding litigation, it [would] give due consideration to [Bow's] settlement offer." (Rubell Decl. Ex. C.) It did not specify what action Bow would take in the event that COSA failed to respond by the deadline, nor did it identify a venue for suit. Moreover, COSA did not respond to Bow by the May 10th deadline and Bow did not file suit. The fact that Bow did not file suit makes clear that his letters were mere attempts at settlement, not notices that Bow intended to file immediate suit in Illinois. See <u>Fandino</u>, 2010 WL 607819, at *3 (finding that party's failure to file suit after deadline passed without response from adversary "demonst[r]ates that . . . references to litigation were merely general threats, not specific references to filing an immediate suit").

Bow argues that COSA's settlement communications to Bow were "intended to string Bow along long enough to be able to file

28

a Complaint in the venue that would be most inconvenient and costly to Bow." (Def.'s Br. at 11.) The facts here compel the opposite conclusion. On May 8, 2013, Bow's attorney wrote to COSA's attorney and stated that Bow was "willing to make a reasonable compromise to his claims" in that he would "waive recovery of [his attorney's] fees and provide COSA with a signed General Release, if COSA agree[d] to pay the agreed upon severance and the business expenses for which [Bow was] to be reimbursed by Friday May 10." (Rubell Decl. Ex. C.) COSA's attorney responded after the May 10th deadline and made it very clear that COSA did not find Bow's concession of attorney's fees to be a "substantive settlement offer" and explicitly stated that COSA "would need a meaningful settlement offer from [Bow]" to resolve the dispute. (Rubell Decl. Ex. D.) After that communication, four days passed without another settlement offer from Bow. The Court finds that, under these circumstances, it was entirely reasonable for COSA to conclude that Bow would not compromise on the amount in dispute and COSA therefore appropriately filed the New York Action in a forum most convenient to COSA. Indeed, even after the filing, but before service of the Complaint, Bow's counsel informed COSA that Bow "want[ed] that to which he [was] entitled and ha[d] no interest in arriving at a middle ground." (McLaughlin Reply Decl. ¶ 15.) If Bow was concerned about litigating this action in an inconvenient forum, Bow had ample time to file suit in Illinois before COSA

filed the New York Action on May 17, 2013.  Thus, the Court finds that the New York Action was not an improper anticipatory filing.

## 2.   Balance of Convenience

As discussed below, the balance of convenience factors do not favor departure from the first-filed rule or transfer to the Northern District of Illinois pursuant to 28 U.S.C. § 1404(a).

### i.   Plaintiff's Choice of Forum

As a general rule, "a plaintiff's choice of forum is presumptively entitled to substantial deference."  Gross v. British Broad. Corp., 386 F.3d 224, 230 (2d Cir. 2004) (citation omitted), especially where, as here, the plaintiff is a resident of the forum district, Berman v. Informix Corp., 30 F. Supp. 2d 653, 659 (S.D.N.Y. 1998).  However, the deference given to this factor is diminished where the operative facts did not occur in the forum chosen by the plaintiff.  Guccione v. Harrah's Mktg. Servs. Corp., No. 06-CV-4361, 2009 WL 2337995, at *7 (S.D.N.Y. July 29, 2009) ("While significant deference is normally accorded to plaintiff's choice of forum, this factor 'is given less weight where the case's operative facts have little connection with the chosen forum.'" (quoting Mitsui Marine & Fire Ins. Co. v. Nankai Travel Int'l Co., 245 F. Supp. 2d 523, 525 (S.D.N.Y. 2003)));  GLMKTS, Inc. v. Decorize, Inc., No. 04-CV-2805, 2004 WL 2434717, at *3 (E.D.N.Y. Nov. 1, 2004) ("A plaintiff's choice will merit less deference, however, where it is [not] . . . the locus of the

majority of operative events." (internal quotation marks and citations omitted)).

Here, COSA filed in the Eastern District of New York, where its principal place of business is located. In addition, as discussed next, the Court finds that the operative facts point equally to New York and Illinois as the locus of this action. Accordingly, the Court affords COSA's choice of forum considerable weight, and this factor therefore weighs significantly against transfer to Illinois or departure from the first-filed rule.

ii.    Locus of Operative Facts

Bow argues that transfer to the Northern District of Illinois is warranted because "the operative facts concerning the causes of action alleged occurred almost solely in the State of Illinois." (Def.'s Br. at 13.) The Court disagrees. Rather, the Court finds that the facts point equally to New York and Illinois as the locus of operative facts in this case. This factor is therefore neutral.

With respect to a breach of contract claim, the locus of operative facts considers "where the contract was negotiated or executed, where it was to be performed, and where the alleged breach occurred." Hines v. Overstock.com, Inc., 668 F. Supp. 2d 362 (E.D.N.Y. 2009) (quoting Reinhard v. Dow Chem. Co., No. 07-CV-3641, 2007 WL 2324351, at *6 (S.D.N.Y. Aug. 13, 2007), aff'd, 380 F. App'x 22 (2d Cir. 2010). In the context of a § 1404(a)

venue analysis, a court "may determine that there are several loci of operative facts." Adams v. Key Tronic Corp., No. 94-CV-0535, 1997 WL 1864, at *4 (S.D.N.Y. Jan. 2, 1997).

Applying this analysis here, the Court finds that the facts from which COSA's breach of contract claim arise took place in both New York and Illinois. First, the parties negotiated the Employment Letter and the Severance Agreement via long-distance communications in Illinois and New York. Second, although Bow spent the majority of his time physically working in Illinois and other locations, he also performed in New York. Moreover, the alleged overpaid commissions, which are the core of this lawsuit, were calculated in New York by COSA. Third, the alleged breach of the Employment Letter—i.e., the failure to return the alleged overpaid commissions--arguably occurred in Illinois where Bow resides. However, as noted, the negotiation and performance occurred both in New York and Illinois, and the impact of the breach caused harm in New York. Accordingly, on balance, the Court finds that the facts point equally to New York and Illinois as the locus of operative facts in this case. This factor is therefore neutral. See Guardian Life Ins. Co. of Am. v. Hernandez, No. 11-CV-2114, 2011 WL 3678134, at *4 (S.D.N.Y. Aug. 22, 2011) (finding "locus of operative facts" factor neutral, even though the alleged breach occurred in the proposed transferee forum, because "the negotiation and performance . . . occurred in both states, and the

32

impact of breach was felt at least as strongly in New York, if not more strongly"); <u>Prudential Secs. Inc. v. Norcom Develop., Inc.</u>, No. 97-CV-6308, 1998 WL 397889, at *5 (S.D.N.Y. July 16, 1998) (denying motion to transfer venue to the forum where the breach occurred because the negotiation, execution, and performance of the contract occurred in both venues).

### iii.   Relative Ease of Access to Sources of Proof

While it is true that the majority of the documents at issue in this case are located in the Eastern District of New York, the Court does not find this significant as "[t]he location of relevant documents is largely a neutral factor in today's world of faxing, scanning, and emailing documents." <u>Am. Steamship</u>, 474 F. Supp. 2d at 484.   Accordingly, the location of documents is a neutral factor here.

### iv.   Convenience of the Witnesses

Bow admits that "[t]he majority of the witnesses will be high level employees of COSA who hired Bow and made the original agreements with Bow." (Def.'s Br. at 13.)   Thus, Bow does not appear to argue that the convenience of witnesses favors transfer to the Northern District of Illinois. Rather, Bow appears to argue that since these COSA executives "were perfectly aware that they could be called to testify in Illinois when they made agreements with an individual who lived in Illinois," this factor "carries little weight against transferring." (Def.'s Br. at 13.)   However,

Bow has not explained why this factor favors transfer to the Northern District of Illinois or departure from the first-filed rule. COSA, however, has identified two employee witnesses who reside in the Eastern District of New York. The Court therefore finds that this factor favors New York, but ever so slightly.

### v. Availability of Process to Compel Unwilling Witnesses

COSA argues that "[i]f the case were transferred to Illinois, COSA would not be able to subpoena [COSA's former Chief Financial Officer] as a witness and this fact weighs against transfer." (Pl.'s Br. in Supp. of Cross-Mot. and in Opp. to Def.'s Mot. to Dismiss ("Pl.'s Br."), Docket Entry 18, at 22.) However, COSA does not allege that its former Chief Financial Officer has indicated that he would be unwilling to testify in Illinois absent compulsion. Thus, this factor is not applicable here. See Soto v. Bey Transp. Co., No. 95-CV-9329, 1997 WL 407247, at *4 (S.D.N.Y. July 21, 1997) ("Nothing has been presented to suggest that any of the non-party witnesses would be unwilling to testify. Therefore, this factor does not enter the Court's analysis.").

### vi. Forum's Familiarity with the Law

The parties spend a great deal of time arguing over whether New York or Illinois law applies to this action. Bow appears to admit that New York law would govern the Severance Agreement but claims that "any dispute over the Employment

34

Agreement is actually governed by Illinois law such as [the] Illinois Wage and Payment Collection Act." (Def.'s Br. at 14.) The Court need not resolve this dispute now. Even if Illinois law applied to COSA's claims for breach of contract, unjust enrichment, and money had and received, this Court is as capable as an Illinois court of applying Illinois law in this regard because the claims do not present complex questions of foreign law. Accordingly, the Court finds this factor to be neutral.

### vii. Calendar Congestion

Bow argues that calendar congestion favors transfer to the Northern District of Illinois. (Def.'s Br. at 14.) In support of this argument, Bow cites to statistics demonstrating that there are more pending cases per district judge in the Eastern District of New York than there are in the Northern District of Illinois. (Def.'s Br. at 14.) COSA refutes Bow's statistics with its own statistics that there are actually more pending cases in the Northern District of Illinois than there are in the Eastern District of Illinois. (Pl.'s Br. at 24.) The Court need not reconcile the parties' statistics. "Although this factor should be accorded some weight in determining a motion pursuant to § 1404(a), it is not dispositive," Laumann Mfg. Corp. v. Castings USA, Inc., 913 F. Supp. 712, 721 (E.D.N.Y. 1996) (citation omitted), and the Court affords this factor little weight here. See Advance Relocation & Storage, Inc. v. Wheaton Van Lines, Inc.,

No. 99-CV-2491, 2000 WL 33155640, at *10 (E.D.N.Y. Sept. 15, 2000);
Laumann, 913 F. Supp. at 721.

### viii. Relative Means of the Parties

The final factor, the relative means of the parties,
favors the Illinois Action and transfer to the Northern District
of Illinois. COSA is a corporation that "does approximately $20
million of business yearly." (Bow Decl. ¶ 10.) Bow is an
individual. He states that he has been unemployed since March
2013 and is experiencing financial difficulties. (Bow Reply Decl.
¶ 18.) Although Bow's argument that this factor favors Illinois
is "weakened because he offered no documentation beyond a
declaration to support that it would be prohibitively expensive to
prosecute the action [in New York]," Pecorino v. Vutec Corp., 934
F. Supp. 2d 422, 439 (E.D.N.Y. 2012) (citation omitted), the Court
finds that based on the facts before it, it would be easier for
COSA to litigate in Illinois than for Bow to litigate in New York.

### ix. Balance of the Factors

There being only one factor in favor of the Illinois
Action, the Court finds that transfer of this case or departure
from the first-filed rule would not be appropriate. Although the
relative means of the parties favors Illinois, this factor alone
does not outweigh the deference accorded to COSA's choice of forum
in New York, the first-filed forum, as well as the fact that New
York is one of the loci of operative facts. Accordingly, COSA's

motion to enjoin the Illinois Action is GRANTED and Bow's motion to transfer this case to the Northern District of Illinois is DENIED.

III. Bow's Motions to Strike

Finally, Bow moves to strike the moving and reply declarations of Allshouse and Rubell that COSA filed in connection with its opposition to Bow's motion for a change of venue and its cross-motion to enjoin the Illinois Action. Bow argues that the declarations should be stricken because they "are rife with both conclusory allegations and legal arguments." (Def.'s Br. in Supp. of First Mot. to Strike, Docket Entry 20, at 2; see also Def.'s Br. in Supp. of Second Mot. to Strike, Docket Entry 27, at 2.) Bow also argues that the Allshouse and Rubell Reply Declarations include new facts that should be stricken or, in the alternative, Bow should be permitted to file a "Rebuttal Declaration so that he might address the new 'facts' that he did not previously have an opportunity to address." (Def.'s Br. in Supp. of Second Mot. to Strike at 7.) As discussed below, the Court declines to strike the Allshouse and Rubell declarations.

Motions to strike are governed by Federal Rule of Civil Procedure 12(f), which provides, in relevant part, that "[t]he court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." FED R. CIV. P. 12(f). "Resolution of a Rule 12(f) motion is left to the

district court's discretion." E.E.O.C. v. Bay Ridge Toyota, Inc., 327 F. Supp. 2d 167, 170 (E.D.N.Y. 2004). However, motions to strike are disfavored. See Illiano v. Mineola Union Free Sch. Dist., 585 F. Supp. 2d 341, 357 (E.D.N.Y. 2008). "[T]o prevail on a Rule 12(f) motion to strike, the movant must show '(1) no evidence in support of the allegations would be admissible; (2) the allegations have no bearing on the relevant issues; and (3) permitting the allegations to stand would result in prejudice to the movant.'" Lynch v. Southampton Animal Shelter Found. Inc., 278 F.R.D. 55, 63 (E.D.N.Y. 2011) (quoting Roe v. City of N.Y., 151 F. Supp. 2d 495, 510 (S.D.N.Y. 2001)).

Bow's motions to strike are DENIED. First, the Court has not relied on the Allshouse or Rubell Reply Declarations in reaching its decision herein. Accordingly, Bow's second motion to strike is DENIED AS MOOT. Second, the Court is in agreement with other courts in this Circuit that the Court is "more than capable of parsing legal conclusions from factual assertions" without a motion to strike. Colabufo v. Cont'l Cas. Co., No. 04-CV-1863, 2006 WL 1210919 (E.D.N.Y. Apr. 27, 2006); see Metro. Intercollegiate Basketball Ass'n v. NCAA, 337 F. Supp. 2d 563, 573 (S.D.N.Y. 2004) (denying motion to strike affidavit and disregarding any legal conclusions contained therein). To the extent that the Allshouse and Rubell Declarations contain any legal

conclusions, the Court has not relied on them. Accordingly, Bow's motions to strike are DENIED on this ground as well.

## CONCLUSION

For the foregoing reasons, Bow's motion to dismiss for improper venue is DENIED, Bow's motion to transfer venue is DENIED, COSA's motion to enjoin the Illinois Action is GRANTED, and Bow's motions to strike are DENIED.

SO ORDERED.

/s/ JOANNA SEYBERT
Joanna Seybert, U.S.D.J.

DATED:    March   31   , 2014
          Central Islip, New York